ORIGINAL

Approved: *Thomas John Wright*
             THOMAS JOHN WRIGHT
             Assistant United States Attorney

Before:   THE HONORABLE ROBERT W. LEHRBURGER
          United States Magistrate Judge
          Southern District of New York

------------------------------------x
                                    :    **20 MAG 7216**
UNITED STATES OF AMERICA            :    SEALED COMPLAINT
                                    :
        - v. -                      :    Violation of 21 U.S.C.
                                    :    § 846
TATIANA VENEGAS,                    :
                                    :
                Defendant.          :    COUNTY OF OFFENSE:
                                    :    NEW YORK
------------------------------------x

SOUTHERN DISTRICT OF NEW YORK, ss:

        MICHAEL DEALMEIDA, being duly sworn, deposes and says that he is a Detective with the New York City Police Department and a Task Force Officer with the Border Enforcement Security Task Force, and charges as follows:

### COUNT ONE

(Narcotics Conspiracy)

        1.   From at least in or about May 2020 through at least in or about July 2020, in the Southern District of New York and elsewhere, TATIANA VENEGAS, the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

        2.   It was a part and an object of the conspiracy that TATIANA VENEGAS, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

        3.   The controlled substance that TATIANA VENEGAS, the defendant, conspired to distribute and possess with intent to distribute was five kilograms and more of mixtures and substances

containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge of the foregoing charge are, in part, as follows:

4. I am a Detective with the New York City Police Department, currently assigned as a Task Force Officer to the Department of Homeland Security, Homeland Security Investigations Border Enforcement Security Task Force ("BEST"), and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law-enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Recorded Communications and Meetings with an
Undercover Police Officer Between May and July 2020

5. Since in or about May 2020, BEST has conducted an investigation into a drug trafficking organization that is attempting to import a wholesale quantity of cocaine into the United States for distribution in the metropolitan area of the City of New York. The investigation came to focus upon multiple subjects, including TATIANA VENEGAS, the defendant, with certain of whom, including VENEGAS, an undercover police officer ("UC-1"), who is fluent in English and Spanish, has participated in recorded communications transmitted over multiple cellphones concerning the importation and distribution of cocaine. In particular, I am informed by UC-1 of the following information related to communications and meetings between UC-1, VENEGAS, and a co-conspirator of VENEGAS ("CC-2"):

a. On or about May 30, 2020, an unidentified person, whose voice UC-1 subsequently recognized as that of VENEGAS based on a later video-call conversation with her, placed two telephone calls to UC-1 from a cellphone assigned a particular telephone number (the "Venegas Number"), for which the subscriber is listed as "Tatiana Venegas." For these reasons and because the photograph associated with the Venegas Number on WhatsApp is a photograph of

a person whom UC-1 recognizes as VENEGAS based on familiarity with a known photograph of VENEGAS, UC-1 believes that the unidentified person was VENEGAS. During these calls in which VENEGAS and UC-1 conversed principally in Spanish, VENEGAS, in substance and in part, asked UC-1, who posed as a supplier of cocaine, whether UC-1 could supply approximately 300 kilograms of cocaine. Later, on or about June 3, 2020, VENEGAS placed a further telephone call to UC-1 from the Venegas Number and participated in a further conversation principally in Spanish with UC-1 in which VENEGAS and UC-1 further discussed, in substance and in part, a possible cocaine transaction involving another member of the drug trafficking organization to whom VENEGAS planned to introduce UC-1.

    b. Thereafter, on or about July 6, 2020, UC-1 participated in a conference call transmitted over WhatsApp with VENEGAS and CC-2, whose voice UC-1 subsequently recognized as that of CC-2 based on an in-person conversation with CC-2 the following day. In particular, during the conference call, VENEGAS, who participated in the conference call over WhatsApp using the Venegas Number, introduced UC-1 to CC-2, who participated in the conference call over WhatsApp using the telephone number for a cellphone assigned a particular telephone number (the "CC-2 Number"), which appeared as an icon for CC-2 during the conference call. In the ensuing conversation, UC-1, who spoke in Spanish, which VENEGAS translated into English for CC-2, and CC-2, who spoke in English, which VENEGAS translated into Spanish for UC-1, discussed, in substance and in part, the terms of a possible cocaine transaction in which UC-1 would supply a wholesale quantity of cocaine to CC-2. During this conversation, UC-1 and CC-2 agreed, in substance and in part, to meet in person the following day in the vicinity of Battery Park in Manhattan to discuss further the contemplated transaction.

    c. Accordingly, the following day, on or about July 7, 2020, UC-1 and CC-2 (whom UC-1 recognized based on familiarity with a known photograph of CC-2) met in Battery Park in Manhattan. At the meeting, CC-2 used a cellphone on his person to initiate a video call over WhatsApp to VENEGAS (whom UC-1 recognized based on familiarity with a known photograph of VENEGAS). In the ensuing conversation, in which VENEGAS again provided translation for UC-1, who spoke in Spanish, and CC-2, who spoke in English, UC-1 and CC-2 further discussed, in substance and in part, the contemplated transaction, ultimately agreeing that UC-1 would supply approximately 100 kilograms of cocaine to CC-2 for $28,000 per kilogram and an overall price of $2.8 million. Further, UC-1 and CC-2 agreed, in substance and in part, to conduct an initial

installment of this transaction involving approximately 50 kilograms of cocaine later the same week (*i.e.*, this past week).

### Planned Cocaine Transaction on July 10, 2020

6. Thereafter, on or about July 8, 2020, the Honorable Sarah Netburn, United States Magistrate Judge for the Southern District of New York, issued warrants authorizing the collection of location information for the Venegas Number and the CC-2 Number, which location information I began to receive on or about July 9, 2020.

7. Based on my review of data from the New York State Department of Motor Vehicles, I previously identified in the course of this investigation that the current New York State Driver's License for CC-2, lists the address for a specific apartment (the "CC-2 Apartment") as CC-2's residence and that multiple cars currently registered in CC-2's name similarly list the CC-2 Apartment as CC-2's residence. In addition, based on my review of arrest records of the NYPD, I know that CC-2 has listed his principal residence as the address for the CC-2 Apartment on multiple occasions, including in connection with an arrest in or about 2012. In addition, I have searched Accurint, a database of public and private records compiled by Thomson Reuters, which lists the address for the CC-2 Apartment as CC-2's principal residence.

8. Based on location information for the CC-2 Number, which placed the CC-2 Number in the vicinity of the CC-2 Apartment, which is located in Queens County, New York and which I had previously identified, as described in the preceding paragraph, *infra*, as the principal residence of CC-2, on or about July 9, 2020, I conducted surveillance outside the CC-2 Apartment, where I saw CC-2 sitting on the short flight of stairs that leads to the front door of the CC-2 Apartment.

9. I am further informed by UC-1 that from on or about July 7, 2020 through July 10, 2020, over the course of multiple communications transmitted between UC-1 and TATIANA VENEGAS, the defendant, on the Venegas Number, UC-1 arranged, in substance and in part, to meet CC-2 initially at one or more locations in Richmond County, New York and ultimately at a location in Queens County, New York. Amidst the communications arranging that initial meeting location, VENEGAS texted UC-1 from the Venegas Number a photograph that purported to depict CC-2's hand on top of a large quantity of United States currency. In the background of this photograph, the interior of a car is visible, which based on my subsequent involvement in the search of this car, as described in ¶ 17, *infra*, I identified as Car-1. Car-1 is defined in ¶ 10, *infra*.

10. I am informed by other members of BEST that on or about July 10, 2020 at approximately 11:11 AM, after having observed CC-2 walk in and out of the CC-2 Apartment on multiple occasions that same morning, these members of BEST saw two cars ("Car-1" and "Car-2") parked in front of the CC-2 Apartment. At this same time, another male walked out of the CC-2 Apartment ("Male-1") and got into Car-1. Members of BEST then saw Car-1 drive away from the CC-2 Apartment with Male-1 and one other male, who could not be observed clearly, and Car-2 drive away with two other males, who similarly could not be observed clearly. From the CC-2 Apartment, members of BEST tracked Car-1 and Car-2 to Richmond County, New York using the location information for the CC-2 Number, which based on my review of the location information for the CC-2 Number, I know moved in synchronization with Car-1 and Car-2.

11. I am further informed by UC-1 that after Car-1 and Car-2 departed the CC-2 Apartment, on July 10, 2020, over the course of multiple communications transmitted between UC-1 and TATIANA VENEGAS, the defendant, on the Venegas Number, UC-1 arranged, in substance and in part, to meet CC-2 in the vicinity of a hotel in Richmond County, New York past which UC-1 would drive and from which CC-2 would follow UC-1 to another meeting location agreed upon for the planned narcotics transaction between UC-1 and CC-2.

12. Thereafter, in Richmond County, New York, other members of BEST saw Car-1 and Car-2 pull out from the parking lot of this hotel and follow an unmarked car in which UC-1 drove past the hotel, as instructed by CC-2, through TATIANA VENEGAS, the defendant, and in which UC-1 began to lead Car-1 and Car-2 to the other meeting location agreed upon for the planned narcotics transaction between UC-1 and CC-2. After driving in convoy for approximately 15 to 20 minutes, however, immediately before reaching that other meeting location, members of BEST saw Car-1 and Car-2 speed away from the other meeting location.

13. I am informed by UC-1 that thereafter, in communications transmitted over the Venegas Number, TATIANA VENEGAS, the defendant, informed UC-1 that CC-2 wished now instead to meet UC-1 at the ultimate meeting location in Queens County, New York to conduct the planned narcotics transaction and requested that UC-1 drive past this location to confirm UC-1's presence there, after which CC-2 would arrive at the location.

14. Following the aborted meeting at the initial meeting location in Richmond County, New York, I am informed by other members of BEST that they saw both Car-1 and Car-2 again parked in front of the CC-2 Apartment.

5

15.     Finally, on or about July 10, 2020 at approximately 4:50 PM, a short time after UC-1 in fact did drive past the ultimately agreed-upon meeting location in Queens County, New York, I am informed by other members of BEST, who were positioned outside of the CC-2 Apartment, that they saw CC-2, Male-1, and one other male walk out of the front door to the CC-2 Apartment, with CC-2 carrying a large piece of luggage, which he began to roll as he approached Car-1, which was parked in the vicinity of the CC-2 Apartment, whose driver's door he opened, at which point other members of BEST stopped and detained him, Male-1, and the other male.

16.     Inside this large piece of luggage, which CC-2 gave verbal consent in my presence for members of BEST to search, I observed members of BEST find over $500,000 of United State currency.

17.     After being advised of and waiving his *Miranda* rights, Male-1 gave written consent in my presence for members of BEST to search Car-1, which is registered in Male-1's name. During an ensuing search of Car-1, I observed members of BEST find two further large pieces of luggage inside Car-1. I am informed by members of BEST that inside each piece of luggage they found additional hundreds of thousands of dollars of United States currency.

### Search Warrant on July 10, 2020

18.     Thereafter, on or about July 10, 2020, the Honorable Vera M. Scanlon, United States Magistrate Judge for the Eastern District of New York, issued a warrant authorizing the search of the CC-2 Apartment, which, together with other members of BEST, I participated in executing immediately.

19.     Inside the vestibule of the CC-2 Apartment, immediately past the front door of the CC-2 Apartment, I saw multiple additional large pieces of luggage lined up against the wall. I observed members of BEST find inside each piece of luggage additional hundreds of thousands of dollars of United States currency.

20.     Inside the kitchen of the CC-2 Apartment, I found a cellphone assigned the CC-2 Number.

21.     Inside a closet of the CC-2 Apartment, which is a one-bedroom apartment, I found a concealed compartment, inside of which I found additional hundreds of thousands of dollars of United States currency, an assault rifle and multiple magazines and rounds

of ammunition for the assault rifle, and a pistol and multiple magazines and rounds of ammunition for the pistol.

22. Below are photographs of the United States currency, firearms, and other items seized from the CC-2 Apartment, Car-1, and the luggage that CC-2 was transporting to Car-1 when CC-2 was detained.



Possession of Cellphone

23. I am informed by other members of BEST that on or about July 10, 2020 at approximately 5:00 PM, they approached and spoke with TATIANA VENEGAS, the defendant, at a time when they saw her holding a cellphone in her hand. At this same time, based on the location information for the Venegas Number, these members of BEST knew that the Venegas Number was in the vicinity of VENEGAS, whose subsequent observed location similarly mirrored the subsequent observed location of the Venegas Number.

7

WHEREFORE, I respectfully request that TATIANA VENEGAS, the defendant, be imprisoned or bailed, as the case may be.

S/ by the Court with authority
--------------------------------
MICHAEL DEALMEIDA
Detective and Task Force Officer
New York City Police Department
Border Enforcement Security Task Force

Sworn to me through the transmission of this
Complaint by reliable electronic means (Teleconference),
pursuant to Federal Rule of Criminal Procedure 4.1, on
July 12, 2020

*[signature]*
THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK